KSC/05.18.22



**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*
*Northern Division*

| | | | |
|---|---|---|---|
| Zachary Stendig<br>Assistant United States Attorney<br>Zachary.Stendig@usdoj.gov | Mailing Address:<br>36 S. Charles Street, 4th Floor<br>Baltimore, MD 21201 | Office Location:<br>36 S. Charles Street, 4th Floor<br>Baltimore, MD 21201 | DIRECT: 410-209-4893<br>MAIN: 410-209-4800<br>FAX: 410-962-0717 |

June 14, 2022

**VIA EMAIL**

Christopher C. Nieto, Esq.
Nieto Law Office
1 North Charles Street, Suite 1301
Baltimore, MD 21201

   Re:  <u>United States v. Anuar Dubon-Artiaga</u>
      Criminal No. SAG-21-034

Dear Counsel:

   This letter, together with the Sealed Supplement, confirms the plea agreement (this "Agreement") that has been offered to your client, Anuar Dubon-Artiaga (hereinafter "Defendant"), by the United States Attorney's Office for the District of Maryland ("this Office"). If the Defendant accepts this offer, please have the Defendant execute it in the spaces provided below. If this offer has not been accepted by May 31, 2022, it will be deemed withdrawn. The terms of the Agreement are as follows:

Offense of Conviction

   1.  The Defendant agrees to plead guilty to Counts One and Three of the Indictment, which charge the Defendant with Assault with a Dangerous Weapon in Aid of Racketeering, in violation of 18 U.S.C. § 1959(a)(3), and Conspiracy to Commit Assault with a Dangerous Weapon in Aid of Racketeering, in violation of 18 U.S.C. § 1959(a)(6). The Defendant admits that the Defendant is, in fact, guilty of the offenses and will so advise the Court.

Elements of the Offense

   2.  The elements of the offenses to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows:

<u>As to Count One (Assault with a Dangerous Weapon in Aid of Racketeering)</u>

     1) The existence of an "enterprise" as defined in 18 U.S.C. § 1959(b)(2);

     2) that the enterprise engaged in, or its activities affected, interstate or foreign commerce;

Rev. August 2018

3) that the charged enterprise engaged in "racketeering activity" as defined in 18 U.S.C. §§ 1959(b)(1) and 1961(1);

4) that the defendant committed, or aided and abetted the commission of, assault with a dangerous weapon, which crime violated state or federal law; and

5) that the assault was committed for the purpose of maintaining or increasing position in the charged enterprise.

As to Count 3 (Conspiracy to Commit Assault with a Dangerous Weapon in Aid of Racketeering)

1) The existence of an "enterprise" as defined in 18 U.S.C. § 1959(b)(2);

2) that the enterprise engaged in, or its activities affected, interstate or foreign commerce;

3) that the charged enterprise engaged in "racketeering activity" as defined in 18 U.S.C. §§ 1959(b)(1) and 1961(1);

4) that the defendant conspired with others to commit assault with a dangerous weapon, which crime violated state or federal law; and

5) that the assault was committed for the purpose of maintaining or increasing position in the charged enterprise.

## Penalties

3. The maximum penalties provided by statute for the offenses to which the Defendant is pleading guilty are as follows:

| Count | Statute | Minimum Prison | Maximum Prison | Supervised Release | Maximum Fine | Special Assessment |
|---|---|---|---|---|---|---|
| 1 | 18 U.S.C. § 1959(a)(3) | 0 years | 20 years | Up to 3 years | $250,000 | $100 |
| 1 | 18 U.S.C. § 1959(a)(6) | 0 years | 3 years | Up to 1 year | $250,000 | $100 |

1) Prison: If the Court orders a term of imprisonment, the Bureau of Prisons has sole discretion to designate the institution at which it will be served.

2) Supervised Release: If the Court orders a term of supervised release, and the Defendant violates the conditions of supervised release, the Court may order the Defendant

Rev. August 2018

returned to custody to serve a term of imprisonment as permitted by statute, followed by an additional term of supervised release.

        3)      Restitution: The Court may order the Defendant to pay restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664.

        4)      Payment: If a fine or restitution is imposed, it shall be payable immediately, unless the Court orders otherwise under 18 U.S.C. § 3572(d). The Defendant may be required to pay interest if the fine is not paid when due.

        5)      Forfeiture: The Court may enter an order of forfeiture of assets directly traceable to the offense, substitute assets, and/or a money judgment equal to the value of the property subject to forfeiture.

        6)      Collection of Debts: If the Court imposes a fine or restitution, this Office's Financial Litigation Unit will be responsible for collecting the debt. If the Court establishes a schedule of payments, the Defendant agrees that: (1) the full amount of the fine or restitution is nonetheless due and owing immediately; (2) the schedule of payments is merely a minimum schedule of payments and not the only method, nor a limitation on the methods, available to the United States to enforce the judgment; and (3) the United States may fully employ all powers to collect on the total amount of the debt as provided by law. Until the debt is paid, the Defendant agrees to disclose all assets in which the Defendant has any interest or over which the Defendant exercises direct or indirect control. Until the money judgment is satisfied, the Defendant authorizes this Office to obtain a credit report in order to evaluate the Defendant's ability to pay, and to request and review the Defendant's federal and state income tax returns. The Defendant agrees to complete and sign a copy of IRS Form 8821 (relating to the voluntary disclosure of federal tax return information) and a financial statement in a form provided by this Office.

<u>Waiver of Rights</u>

4.      The Defendant understands that by entering into this Agreement, the Defendant surrenders certain rights as outlined below:

        1)      If the Defendant had pled not guilty and persisted in that plea, the Defendant would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

        2)      If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

3) If the Defendant went to trial, the Government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the Government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in defense, however, the Defendant would have the subpoena power of the Court to compel the witnesses to attend.

4) The Defendant would have the right to testify in the Defendant's own defense if the Defendant so chose, and the Defendant would have the right to refuse to testify. If the Defendant chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from the Defendant's decision not to testify.

5) If the Defendant were found guilty after a trial, the Defendant would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

6) By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that the Defendant may have to answer the Court's questions both about the rights being given up and about the facts of the case. Any statements that the Defendant makes during such a hearing would not be admissible against the Defendant during a trial except in a criminal proceeding for perjury or false statement.

7) If the Court accepts the Defendant's plea of guilty, the Defendant will be giving up the right to file and have the Court rule on pretrial motions, and there will be no further trial or proceeding of any kind in the above-referenced criminal case, and the Court will find the Defendant guilty.

8) By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status, including possible denaturalization. The Defendant recognizes that if the Defendant is not a citizen of the United States, or is a naturalized citizen, pleading guilty may have consequences with respect to the Defendant's immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including the Defendant's attorney or the Court, can predict with certainty the effect of a conviction on immigration status. The Defendant is not relying on any promise or belief about the immigration consequences of pleading guilty. The Defendant nevertheless affirms that the Defendant wants to plead guilty regardless of any potential immigration consequences.

Advisory Sentencing Guidelines Apply

5.   The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. §§ 3551-3742 (excepting 18 U.S.C. §§ 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

Factual and Advisory Guidelines Stipulation

6.   This Office and the Defendant stipulate and agree to the Statement of Facts set forth in Attachment A, which is incorporated by reference herein.

1)   This Office and the Defendant further agree that the applicable base offense levels for both Counts One and Three is **fourteen (14)** pursuant to United States Sentencing Guidelines ("U.S.S.G.") §§ 2E1.3(a)(2) and 2A2.2(a)).

2)   That offense level is increased by **two (2)** levels because the assault involved more than minimal planning, pursuant to U.S.S.G. § 2A2.2(b)(1).

3)   The offense level is further increased by **four (4)** levels because a dangerous weapon was otherwise used, pursuant to U.S.S.G. § 2A2.2(b)(2)(B).

4)   The offense level is further increased by **seven (7)** levels because the victim sustained permanent bodily injury, pursuant to U.S.S.G. § 2A2.2(b)(3)(C).

5)   However, the cumulative adjustments from the application of subdivisions (2) and (3) of U.S.S.G. § 2A2.2(b) shall not exceed 10 levels, thus the total increase to the base offense level is **twelve (12)** levels for a total offense level of **twenty-six (26)** for Counts One and Three.

6)   Pursuant to U.S.S.G. §3D1.2, Counts One and Three are grouped together into a single Group and there is no adjustment in the total offense level.

7)   This Office does not oppose a **2**-level reduction in the Defendant's adjusted offense level pursuant to U.S.S.G. § 3E1.1(a) based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for the Defendant's criminal conduct. This Office agrees to make a motion pursuant to U.S.S.G. § 3E1.1(b) for an additional **1**-level decrease in recognition of the Defendant's timely notification of the Defendant's intention to enter a plea of guilty. This Office may oppose any adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1(a), and may decline to make a motion pursuant to U.S.S.G. § 3E1.1(b), if the Defendant: (i) fails to admit each and every item in the factual stipulation; (ii) denies involvement in the offense; (iii) gives conflicting statements about the Defendant's involvement in the offense; (iv) is untruthful with the Court, this Office, or the United States Probation Office; (v) obstructs or attempts to obstruct justice prior to sentencing; (vi) engages in any criminal

conduct between the date of this Agreement and the date of sentencing; (vii) attempts to withdraw the plea of guilty; or (viii) violates this Agreement in any way. **As a result, the parties anticipate the Defendant's adjusted offense level will be twenty-three (23).**

7. There is no agreement as to the Defendant's criminal history and the Defendant understands that the Defendant's criminal history could alter the Defendant's offense level. Specifically, the Defendant understands that the Defendant's criminal history could alter the final offense level if the Defendant is determined to be a career offender or if the instant offense was a part of a pattern of criminal conduct from which the Defendant derived a substantial portion of the Defendant's income.

8. Other than as set forth above, no other offense characteristics, sentencing guidelines factors, or potential departures or adjustments set forth in the United States Sentencing Guidelines are in dispute or will be raised in calculating the advisory guidelines range.

## Obligations of the Parties

9. At the time of sentencing, this Office and the Defendant reserve the right to advocate for a reasonable sentence, period of supervised release, and/or fine considering any appropriate factors under 18 U.S.C. § 3553(a). This Office and the Defendant reserve the right to bring to the Court's attention all information with respect to the Defendant's background, character, and conduct that this Office or the Defendant deem relevant to sentencing, including the conduct that is the subject of any counts of the Indictment. At the time of sentencing, this Office will move to dismiss any open counts against the Defendant.

## Waiver of Appeal

10. In exchange for the concessions made by this Office and the Defendant in this Agreement, this Office and the Defendant waive their rights to appeal as follows:

1) The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or any other statute or constitutional provision, to appeal the Defendant's conviction on any ground whatsoever. This includes a waiver of all right to appeal the Defendant's conviction on the ground that the statute(s) to which the Defendant is pleading guilty is unconstitutional, or on the ground that the admitted conduct does not fall within the scope of the statute(s), to the extent that such challenges legally can be waived.

2) The Defendant and this Office knowingly and expressly waive all rights conferred by 18 U.S.C. § 3742 to appeal whatever sentence is imposed (including any term of imprisonment, fine, term of supervised release, or order of restitution) for any reason (including the establishment of the advisory sentencing guidelines range, the determination of the Defendant's criminal history, the weighing of the sentencing factors, and any constitutional challenges to the calculation and imposition of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release), except as follows:

    i.  The Defendant reserves the right to appeal any sentence that exceeds the statutory maximum; and

    ii.  This Office reserves the right to appeal any sentence below a statutory minimum.

  3)  The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

## Forfeiture

11.  The Defendant understands that the Court may enter an Order of Forfeiture as part of the Defendant's sentence, and that the Order of Forfeiture may include assets directly traceable to the offense(s), substitute assets, and/or a money judgment equal to the value of the property derived from, or otherwise involved in, the offenses.

12.  Specifically, but without limitation on the Government's right to forfeit all property subject to forfeiture as permitted by law, the Defendant agrees to forfeit to the United States all of the Defendant's right, title, and interest in the following items that the Defendant agrees constitute money, property, and/or assets derived from or obtained by the Defendant as a result of, or used to facilitate the commission of, the Defendant's illegal activities.

13.  The Defendant agrees to consent to the entry of orders of forfeiture for the property described herein and waives the requirements of Federal Rules of Criminal Procedure 11(b)(1)(J), 32.2, and 43(a) regarding notice of the forfeiture in the charging instrument, advice regarding forfeiture during the change of plea hearing, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment.

14.  The Defendant agrees to assist fully in the forfeiture of the above property. The Defendant agrees to disclose all assets and sources of income, to consent to all requests for access to information related to assets and income, and to take all steps necessary to pass clear title to the forfeited assets to the United States, including executing all documents necessary to transfer such title, assisting in bringing any assets located outside of the United States within the jurisdiction of the United States, and taking whatever steps are necessary to ensure that assets subject to forfeiture are made available for forfeiture.

15.  The Defendant waives all challenges to any forfeiture carried out in accordance with this Agreement on any grounds, including any and all constitutional, legal, equitable, statutory, or administrative grounds brought by any means, including through direct appeal, habeas corpus petition, or civil complaint. The Defendant will not challenge or seek review of any civil or administrative forfeiture of any property subject to forfeiture under this Agreement, and will not assist any third party with any challenge or review or any petition for remission of forfeiture.

Rev. August 2018

7

### Defendant's Conduct Prior to Sentencing and Breach

16. Between now and the date of the sentencing, the Defendant will not engage in conduct that constitutes obstruction of justice under U.S.S.G. § 3C1.1; will not violate any federal, state, or local law; will acknowledge guilt to the probation officer and the Court; will be truthful in any statement to the Court, this Office, law enforcement agents, and probation officers; will cooperate in the preparation of the presentence report; and will not move to withdraw from the plea of guilty or from this Agreement.

17. If the Defendant engages in conduct prior to sentencing that violates the above paragraph of this Agreement, and the Court finds a violation by a preponderance of the evidence, then: (i) this Office will be free from its obligations under this Agreement; (ii) this Office may make sentencing arguments and recommendations different from those set out in this Agreement, even if the Agreement was reached pursuant to Rule 11(c)(1)(C); and (iii) in any criminal or civil proceeding, this Office will be free to use against the Defendant all statements made by the Defendant and any of the information or materials provided by the Defendant, including statements, information, and materials provided pursuant to this Agreement, and statements made during proceedings before the Court pursuant to Rule 11 of the Federal Rules of Criminal Procedure. A determination that this Office is released from its obligations under this Agreement will not permit the Defendant to withdraw the guilty plea. The Defendant acknowledges that the Defendant may not withdraw the Defendant's guilty plea—even if made pursuant to Rule 11(c)(1)(C)—if the Court finds that the Defendant breached the Agreement. In that event, neither the Court nor the Government will be bound by the specific sentence or sentencing range agreed and stipulated to herein pursuant to Rule 11(c)(1)(C).

### Court Not a Party

18. The Court is not a party to this Agreement. The sentence to be imposed is within the sole discretion of the Court. The Court is not bound by the Sentencing Guidelines stipulation in this Agreement. The Court will determine the facts relevant to sentencing. The Court is not required to accept any recommendation or stipulation of the parties. The Court has the power to impose a sentence up to the maximum penalty allowed by law. If the Court makes sentencing findings different from those stipulated in this Agreement, or if the Court imposes any sentence up to the maximum allowed by statute, the Defendant will remain bound to fulfill all of the obligations under this Agreement. Neither the prosecutor, defense counsel, nor the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive. The Defendant agrees that no one has made such a binding prediction or promise.

### Entire Agreement

19. This letter, together with the Sealed Supplement, constitutes the complete plea agreement in this case. This letter, together with the Sealed Supplement, supersedes any prior understandings, promises, or conditions between this Office and the Defendant. There are no other agreements, promises, undertakings, or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement. No changes to this Agreement will be effective unless in writing, signed by all parties and approved by the Court.

Rev. August 2018

If the Defendant fully accepts each and every term and condition of this Agreement, please sign and have the Defendant sign the original and return it to me promptly.

Very truly yours,

Erek L. Barron
United States Attorney

_____
Zachary Stendig
Assistant United States Attorney
Matthew Hoff
Trial Attorney

I have read and/or have had read to me by a Spanish speaking interpreter this Agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney and an interpreter. I understand it, and I voluntarily agree to it. Specifically, I have reviewed and/or have had read to me by a Spanish speaking interpreter the Factual and Advisory Guidelines Stipulation with my attorney, and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

6/29/22                                    _____
_____                                Anuar Dubon-Artiaga
Date

I am the Defendant's attorney. I have carefully reviewed every part of this Agreement, including the Sealed Supplement, with the Defendant. The Defendant advises me that the Defendant understands and accepts its terms. To my knowledge, the Defendant's decision to enter into this Agreement is an informed and voluntary one.

6/29/22                                    _____
_____                                Christopher Nieto, Esq.
Date

## ATTACHMENT A

## STIPULATION OF FACTS

*The undersigned parties stipulate and agree that if this case had proceeded to trial, this Office would have proven the following facts beyond a reasonable doubt. The undersigned parties also stipulate and agree that the following facts do not encompass all of the evidence that would have been presented had this matter proceeded to trial.*

*La Mara Salvatrucha*, also known as MS-13 ("MS-13"), is a gang composed primarily of immigrants or descendants of immigrants from El Salvador and other Central American countries, with members operating in the State of Maryland, including Baltimore City, Baltimore County, Anne Arundel County, Montgomery County, and Prince George's County, and throughout the United States. In the United States, MS-13 has been functioning since at least the 1980s. MS-13 originated in Los Angeles, California, where MS-13 members banded together for protection against the larger Mexican gangs. MS-13 evolved into a gang that engaged in turf wars for the control of drug distribution locations. MS-13 quickly spread to states across the country, including Maryland. MS-13 is a national and international criminal organization and is one of the largest street gangs in the United States. Gang members actively recruit members, including juveniles, from communities with a large Central American population.

Members of MS-13 are expected to protect the name, reputation, and status of the gang from rival gang members and other persons. MS-13 members require that all individuals show respect and deference to the gang and its membership. To protect the gang and to enhance its reputation, MS-13 members are expected to use any means necessary to force respect from those who showed disrespect, including acts of intimidation and violence.

Members and associates of MS-13 frequently engaged in racketeering activity, as defined in Sections 1959(b)(1) and 1961(1) of Title 18 of the United States Code, including, but not limited to, murder, assault, kidnapping, robbery, extortion, obstruction of justice, threatening, intimidating, and retaliating against witnesses, and drug trafficking, as well as attempts and conspiracies to commit such offenses. MS-13 members are required to commit acts of violence both to maintain membership and discipline within the gang and to act against rival gangs. Participation in criminal activity by a member, particularly violent acts directed at rival gangs or as directed by the gang leadership, increase the respect accorded to that member, resulting in that member maintaining or increasing position in the gang, and opening the door to a promotion to a leadership position. One of the principal rules of MS-13 is that its members must attack and kill rivals whenever possible. Rivals are often referred to as "chavalas." MS-13, in the area of Baltimore County, Baltimore City, Anne Arundel County, Prince George's County, and Montgomery County, Maryland, maintain rivalries with the 18th Street Gang, among others.

Prospective members who join MS-13 are required to complete an initiation process. Individuals who associate with and are friends of the gang are often called "paisas." Individuals who do favors and other acts for the gang are called "paros." Persons being observed by the gang for potential membership are known as "observaciones." Individuals who advance to the final

level before being "jumped in" to MS-13 are called "chequeos" or "cheqs."[1] Chequeos undergo a probationary period during which they are required to commit crimes on behalf of MS-13 to achieve trust and prove their loyalty to the gang. To join MS-13 and become a full member or "homeboy," prospective members are required to complete an initiation process, often referred to as being "jumped in" or "beat in" to the gang. During that initiation, other members of MS-13 beat the new member, usually until a gang member finishes counting aloud to the number thirteen, representing the "13" in MS-13.

MS-13 is an international criminal organization, and is organized in Maryland and elsewhere into "cliques," that is, smaller groups operating in a specific city or region. Cliques operate under the umbrella rules of MS-13. MS-13 cliques often work together cooperatively to engage in criminal activity and to assist one another in avoiding detection by law enforcement. In Maryland and the surrounding area, these cliques include the Carlington clique ("CALS"), Huntington Locos Salvatrucha ("HCLS"), the Virginia clique ("VLS"), Hempstead Locos Salvatruchas ("HLS"), Fulton Locos Salvatruchas ("FLS"), Sailors Locotes Salvatrucha Westside ("SLSW"), Hollywood Locos Salvatruchas ("HLS"), Parkview Locotes Salvatrucha ("PVLS"), Normandie Locotes Salvatruchas ("NLS"), Coronados Locos Salvatruchas ("CLS"), Peajes Locotes Salvatrucha ("PLS"), and Langley Park Salvatruchas ("LPS").

MS-13, including its leadership, members, and associates, constitute an "enterprise" as defined in Sections 1959(b)(2) of Title 18 of the United States Code, that is, a group of individuals associated in fact that engage in, and the activities of which affect, interstate and foreign commerce. The enterprise constitutes an ongoing organization whose members function as a continuing unit for the common purpose of achieving the objectives of the enterprise. The purposes of the enterprise include the following:

1. Preserving and protecting the power, territory, and profits of the enterprise through the use of intimidation, violence, including assaults and murder, and threats of violence;

2. Promoting and enhancing the enterprise and its members' and associates' activities;

3. Keeping victims and potential victims in fear of the enterprise and in fear of its members and associates, through violence and threats of violence;

4. Providing financial support and information to gang members, including those who were incarcerated for committing acts of violence or other offenses; and

5. Providing assistance to other gang members who committed crimes for and on behalf of the gang in order to hinder, obstruct, and prevent law enforcement officers from identifying the offender, apprehending the offender, and trying and punishing the offender.

---

[1] The terms "MS-13 associate" or "associate of MS-13" are used broadly in this Statement of Facts and include persons known as paisas, paros, observaciones, and chequeos. In addition, the names of the titles for levels or ranks of involvement are constantly changing within MS-13.

Rev. August 2018

On or about April 25, 2019, the defendant, Anuar Dubon-Artiaga, along with other members and associates of MS-13, including Co-Conspirator 1, Co-Conspirator 2, Co-Conspirator 3, Co-Conspirator 4, and Co-Conspirator 5, were present at a house located at 427 South Macon Street, Baltimore, Maryland. Prior to arriving at the location, the defendant received a call to come to the location and meet with the other members and associates of MS-13. Prior to the defendant's arrival, the other member and associates of MS-13 saw Victim-1, who lived at the residence, leave the location while wearing Nike Cortez sneakers and a red t-shirt. Red clothing is sometimes worn by MS-13's primary rival, the 18th Street gang. Additionally, Nike Cortez sneakers are often worn by members and associates of MS-13 and it is perceived as an insult to MS-13 members/associates when worn by a rival gang. Additionally, the defendant and the other members and associates of MS-13 believed Victim-1, along with Victim-1's brother, were members of the 18th Street gang because they previously saw them wearing red clothing.

While the defendant and the other members/associates of MS-13 were at the location, Victim-1 returned home and the defendant and the other members and associates of MS-13 confronted Victim-1 about Victim-1's shoes in an alley near the house. Co-Conspirator 3 then ordered Victim-1 to remove his shoes because he told Victim-1 that the shoes could only be worn by MS-13 members. When Victim-1 refused to take off the Nike Cortez sneakers, Co-Conspirator 3 told the defendant and the other members and associates of MS-13 that they were going to attack Victim-1. The entire group, including Victim-1, then entered 427 South Macon Street. Once inside, Co-Conspirator 3 began kicking Victim-1 and Co-Conspirator 2 punched Victim-1 in the chest while wearing a pair of brass knuckles. The defendant and Co-Conspirator 5 then produced machetes. The defendant hit Victim-1 on the back of the neck with the flat part of his machete and Co-Conspirator 5 hit Victim-1 in the face and wrist with his machete. After being struck with the machetes, Victim-1 began bleeding and then removed his shoes. The defendant and the other MS-13 members/associates then fled the location and were captured by surveillance cameras running away from the residence. The defendant and the others later disposed of the machetes used in the attack.

When Baltimore City Police Department (BPD) officers arrived at the location, they found Victim-1 bleeding from his face and wrist, along with blood spatter throughout the kitchen and living room, as well as Victim-1's blood-stained Nike Cortez sneakers. Victim-1 was transported to Bayview Medical Center and underwent surgery to repair tendons and ligaments in his left wrist. Victim-1 also suffered permanent scarring to his face and left wrist and arm.

The defendant agrees that he and the other members and associates of MS-13 conspired to commit and then committed the assault on Victim-1 for the purpose of maintaining and increasing their position in MS-13. The defendant further agrees that he committed the acts described herein unlawfully, knowingly, and willfully, and without legal justification or excuse with the specific intent to do that which the law forbids, and not by mistake, accident, or any other reason. The assault of Victim-1 was a violation of Maryland state law.

SO STIPULATED:

_____
Anatoly Smoklin
Assistant United States Attorney
Matthew Hoff
Trial Attorney

_____
Anuar Dubon-Artiaga
Defendant

_____
Christopher Nieto, Esq.
Counsel for Defendant

Rev. August 2018

13